Filed 7/31/23 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re D.L., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>D.L.,<br><br>        Defendant and Appellant. | A164432<br><br>(San Francisco County<br>Super. Ct. No. JW186213)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT]** |

**THE COURT:**

It is ordered that the opinion filed herein on July 3, 2023, be modified as follows:

1. On page 3, last sentence of the first full paragraph, delete the extra section sign within parentheses so the sentence reads:

   The petition further alleged personal intentional discharge of a firearm (§ 12022.53, subds. (c)(d) and use of a firearm (§ 12022.5, subd. (a)).

2. On page 3, in the second full paragraph, in the sentence that ends with the phrase "when he was shot," the phrase is modified to read:

   when multiple assailants, including D.L., opened fire on the gathering.

1

3. On page 9, fifth line from the bottom of the page, insert a period after "p. 2156": (*Id.* at p. 2156.)

4. On page 13, line 3 of footnote 6, the word "track" is changed to "check" so that the quoted portion of the sentence reads:

   "fingerprinting, background check, a mental health records check, and training in firearms handling,"

5. On page 29, delete the paragraph break before the sentence "We agree with *Alexander* and *Odell . . . .*"

6. On page 29, after the citation "*Bruen, supra*, 142 S.Ct. at pp. 2157–2158 (conc. Opn. of Alito, J.).)," add the following two paragraphs:

   In a petition seeking rehearing, D.L. presents an entirely new argument that, even if the "good cause" condition can be severed, sections 26150 and 26155 are still unconstitutional under *Bruen* because (1) they afford unfettered discretion to the relevant law enforcement official who "may issue" a license under each statute, and (2) the statutes still include a subjective condition that the applicant be of "good moral character."

   We reject D.L.'s new argument for three reasons. First, D.L. forfeited his new argument. A petition for rehearing is not the place to raise any argument, let alone a constitutional challenge, for the first time. (See *Curtis Engineering Corp. v. Superior Court* (2017) 16 Cal.App.5th 542, 551, citing *Reynolds v. Bement* (2005) 36 Cal.4th 1075, 1092, abrogated on other grounds in *Martinez v. Combs* (2010) 49 Cal.4th 35, 62–66.) Second, D.L.'s argument is not supported by the actual holding in *Bruen*. As described above, that holding was based on the "proper cause" language in the New York statute, not on its use of the phrase "may issue." (*Bruen, supra*, 142 S.Ct. at pp. 2134, 2156 [applying new constitutional "standard to New York's proper-cause requirement" and holding "New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms"].) Nor did *Bruen* include any holding regarding the "good moral character" condition. Third, D.L.'s new argument concerning the "may issue" language in sections 26150 and 26155 is an "as applied"

2

constitutional challenge and not a facial challenge because the argument would not apply in all circumstances.  (See discussion, *ante*, at pp. 14–16.)  Rather, it would only apply where the sheriff or police chief refused to issue a license without articulating a reason for the rejection.

7.  On Page 29, modify the phrase "Finally, the remaining . . . ." to read:

    In conclusion, the remaining

There is no change in the judgment.

The petition for rehearing, filed July 18, 2023, is denied.


Dated: _____              _____
                                                      Stewart, P.J.

Trial Court:                              San Francisco County Superior Court

Trial Judge:                             Hon. Ellen L. Chaitin

Attorneys for Defendant
and Appellant:                        By appointment of the Court of Appeal
under the First District Appellate Project
Avatar Legal, PC
Cynthia M. Jones

Attorneys for Plaintiff
and Respondent:                    Rob Bonta
Attorney General of California

Lance E. Winters
Chief Assistant Attorney General

Jeffrey M. Laurence
Senior Assistant Attorney General

Bridget Billeter
Deputy Attorney General

Masha A. Dabiza
Deputy Attorney General

Filed 7/3/23 (unmodified opinion)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re D.L., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, Plaintiff and Respondent, v. D.L., Defendant and Appellant. | A164432 (San Francisco County Super. Ct. No. JW186213) |

D.L., who was a minor at the time of his offense, contends that we must reverse his conviction for possession of a loaded firearm in San Francisco. (Pen. Code, § 25850, subd. (a).)[1]  Relying on the United States Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen* (2022) __ U.S. __ [142 S.Ct. 2111] (*Bruen*), D.L. presents what he describes as a "very narrow" argument:  that section 25850 must be unconstitutional on its face as a result of its relationship to California's laws for obtaining a license to carry a concealed weapon.  We reject D.L.'s contention and affirm.

Before *Bruen*, California required an applicant for a concealed carry license to show "good cause" exists for the license, usually by establishing a

---

[1] Further statutory references are to the Penal Code unless otherwise indicated.

1

specific need to carry a gun for self-defense. (§§ 26150, subd. (b)(2), 26155, subd. (b)(2).) D.L. contends that this "good cause" requirement is substantially similar to the "proper cause" requirement for an unrestricted firearm license in New York, which the United States Supreme Court struck down in *Bruen*. (*Bruen, supra*, 142 S.Ct. at p. 2156.) D.L. argues that, since California's "good cause" licensing requirement was unconstitutional, "it was also unconstitutional to punish persons who carried a firearm in public solely because they were unlicensed."

The Attorney General preliminarily responds that D.L. lacks standing to make this argument. We conclude that D.L. has standing here to raise a facial constitutional challenge to section 25850, the statute under which he was convicted.

As to the merits of the challenge, the Attorney General concedes that California's "good cause" requirement for a concealed carry license did not survive *Bruen*. Within a day of the *Bruen* decision, the Attorney General instructed firearm-permitting agencies that proof of "good cause" is no longer required in order for an applicant to receive a concealed carry license. But the Attorney General argues that the "good cause" requirement is severable from the rest of the requirements for obtaining a concealed carry license, thereby saving California's regulatory framework for gun possession and preserving D.L.'s conviction. D.L. responds that California's concealed carry licensing statutes (§§ 26150, 26155) can be construed constitutionally without the "good cause" requirement going forward, but severability cannot be applied retroactively to cure the harm from pre-*Bruen* convictions based on unlicensed possession.

We conclude that the "good cause" requirement in sections 26150 and 26155 is severable from the balance of California's concealed carry licensing

2

framework. We use severability as an analytical tool to evaluate D.L.'s facial constitutional challenge, and we are not persuaded by D.L.'s argument that this tool cannot be applied to a pre-*Bruen* conviction under section 25850. It remains constitutional to punish someone without a license for carrying a loaded gun in public.

## BACKGROUND

The district attorney filed a juvenile wardship petition against D.L. pursuant to Welfare and Institutions Code section 602, subdivision (a), charging him with murder (§ 187, subd. (a)); two counts of assault with a semiautomatic firearm (§ 245, subd. (b)); attempted murder (§§ 664, 187, subd. (a)); conspiracy to commit murder (§ 182, subd. (a)(1)); and unlawful possession of a loaded firearm (§ 25850, subd. (a)). The petition further alleged personal and intentional discharge of a firearm (§§ 12022.53, subds. (c), (d)) and use of a firearm (§ 12022.5, subd. (a)).

The juvenile court found that 17-year-old D.L. killed a six-year-old boy, J.Y., with a gunshot to J.Y.'s torso while attending a July 4, 2020 neighborhood barbeque in San Francisco. J.Y. was at the barbeque with his sister when he was shot. Video footage showed J.Y. holding a firework, and then flinching and doubling over in pain as he is shot. J.Y.'s sister picked him up and started running. She carried him to a nearby house and J.Y. was then transported to the hospital. The court also found D.L. shot an adult twice as the adult was running away up a hill; that victim survived.

Video footage showed D.L. running down the hill seconds after the shooting, stumbling, and then running from the scene. Officers later recovered a Glock .45 caliber handgun in a dirt-filled hole where D.L. had stumbled. DNA swabbed from the handgun was a 99 percent match with

3

D.L.'s DNA. Investigators found a set of .45 caliber shell casings uphill from where D.L. stumbled.

The juvenile court found the counts of the petition against D.L. true as to murder (§ 187, subd. (a)), assault with a semiautomatic firearm (§ 245, subd. (b)), and unlawful possession of a loaded firearm (§ 25850, subd. (a)). In the parlance of California juvenile law, finding a count of a wardship petition to be "true" is like finding an adult criminal defendant "guilty" of the crime charged. (See Welf. & Inst. Code, § 702.) D.L. admitted to several felonies prior to the July 4, 2020 incident, including assault, robbery, and theft in 2018, and burglary in 2019. The court dismissed the attempted murder and conspiracy counts.

The juvenile court committed D.L. to a secure youth treatment facility with a maximum period of confinement of 58 years to life, subject to D.L. attaining 25 years of age pursuant to Welfare and Institutions Code section 875, subdivision (c).[2] D.L. now appeals.

## DISCUSSION

D.L. asks us to reverse only his conviction for possession of a loaded firearm under section 25850 based on the *Bruen* decision. The Attorney General argues that D.L.'s challenge fails because either (1) D.L. lacks standing or (2) the "good cause" licensing requirement can be severed from the balance of California's regulations governing handgun ownership.

---

[2] Welfare and Institutions Code section 875, subdivision (c)(1)(A) states, in relevant part, that "if the ward has been committed to a secure youth treatment facility based on adjudication for an offense or offenses for which the ward, if convicted in adult criminal court, would face an aggregate sentence of seven or more years, the ward shall not be held in secure confinement beyond 25 years of age, or two years from the date of commitment, whichever occurs later."

We begin our analysis with a brief review of Second Amendment jurisprudence and the recent *Bruen* decision. We continue with a synopsis of section 25850 and California's statutory requirements for obtaining a license to carry a concealed firearm. We confirm that D.L. did not forfeit his constitutional argument. We next consider, and reject, the Attorney General's standing argument. We then turn to the core issue presented to us on this facial constitutional challenge: whether, in light of *Bruen*, California's "good cause" licensing requirement renders section 25850 unconstitutional.

We conclude that section 25850 passes constitutional muster. The requirement that an applicant have "good cause" for issuance of a license to carry a concealed firearm can be severed from the rest of California's firearm licensing framework. The *Bruen* decision does not compel a different result, and notes that regulating gun possession remains consistent with the Second Amendment. Using a severability analysis to preserve sections 26150 and 26155, and to maintain D.L.'s conviction, is consistent with California law and with precedent since *Bruen*.

## I. *Bruen* and the Second Amendment

The Second Amendment to the United States Constitution provides: "A well-regulated militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In 2008, for the first time since ratification of the Bill of Rights over 216 years before, the United States Supreme Court identified a constitutionally protected right to possession of handguns in the home in *District of Columbia v. Heller* (2008) 554 U.S. 570, 635 (*Heller*). Under District of Columbia law, it was a crime to carry an unregistered firearm, and the registration of handguns was prohibited. (*Id.* at p. 574.) The District of Columbia required its residents to

5

keep their lawfully owned and registered firearms " 'unloaded and dissembled or bound by a trigger lock or similar device' unless they are located in a place of business or are being used for lawful recreational activities." (*Ibid.*)

The majority in *Heller* found that the "textual elements" of the Second Amendment "guarantee the individual right to possess and carry weapons in case of confrontation," and that this meaning was "strongly confirmed by the historical background of the Second Amendment." (*Heller*, *supra*, 554 U.S. at p. 592.) The *Heller* majority interpreted the phrases "keep arms" and "bear arms" as "unconnected with service in a militia" and inclusive of " 'self-preservation,' " or "the natural right of defense 'of one's person or house.' " (*Id.* at pp. 583, 584.) It concluded that the District of Columbia "handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose" of "self-defense." (*Id.* at p. 628.) "The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute." (*Ibid.*)

While striking down the District of Columbia law, *Heller* reaffirmed the constitutionality of limitations on the right to keep and bear arms. The court observed that the Second Amendment does not grant "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." (*Heller*, *supra*, 554 U.S. at p. 626.) It also identified a non-exhaustive list of "presumptively lawful regulatory measures," including "longstanding" prohibitions on the possession of firearms by felons and the mentally ill, the carrying of firearms in "sensitive places" such as schools and government buildings, and laws "imposing conditions and qualifications on the commercial sale of arms." (*Id.* at pp. 626–627.) Finally, *Heller* noted that the District of Columbia law prohibited any person from carrying a handgun

without a license, but the court did not address the District of Columbia's licensing requirements because the petitioner in the case, who had challenged the handgun ban and trigger-lock requirement, conceded he did not " 'have a problem' " with licensing. (*Id.* at pp. 574, 631.)

Two years after *Heller*, the United States Supreme Court decided *McDonald v. City of Chicago* (2010) 561 U.S. 742 (*McDonald*). The majority in *McDonald* held that the due process clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*. The *Heller* majority's interpretation of the Second Amendment thus applies equally "to both the Federal Government and the States." (*McDonald*, at p. 750.) In *McDonald*, the court sought to avoid over-reaction to its holding, noting the fact that the case simply "does not imperil every law regulating firearms." (*Id.* at p. 786.)

Over the intervening years between *McDonald* and *Bruen*, courts frequently used a two-step approach to analyze the constitutionality of firearm restrictions. The two-step analysis reflected the holding in *Heller* that the Second Amendment protects an individual right to keep and bear arms for self-defense in the home, but the scope of that right is not unlimited. (*United States v. Chovan* (9th Cir. 2013) 735 F.3d 1127, 1136.) The first step was "a textual and historical inquiry; if the government [could] establish that the challenged law regulates activity falling outside the scope of the right as originally understood, then 'the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review.' " (*Ezell v. Chicago* (7th Cir. 2017) 846 F.3d 888, 892.) If the government established that the law fell within the scope of the right to self-defense in the home, courts proceeded to a second step to consider " 'the strength of the government's justification for restricting or regulating the

exercise of Second Amendment rights.' " (*Ibid.*) Courts applied a "means-ends" review based on the severity of the law's burden on the right: the court would apply strict scrutiny for a severe burden on the core right of armed defense, and intermediate scrutiny for burdens on activity "lying closer to the margins of the right." (*Ibid.*)

The Second Amendment landscape changed further in June 2022 with the United States Supreme Court's opinion in *Bruen*. The plaintiffs in *Bruen* had applied in New York for unrestricted licenses to carry a handgun in public for self-defense, which were denied. (*Bruen*, *supra*, 142 S.Ct. at p. 2125.) Under New York law, a person is guilty of criminal possession of a firearm when they possess " 'any firearm' " without a license, whether inside or outside the home. (*Id.* at p. 2122, quoting N.Y. Penal Law § 265.01-b.) A person is guilty of criminal possession of a weapon in the second degree when they possess a loaded firearm outside one's home or place of business without a license. (*Bruen*, at p. 2122, citing N.Y. Penal Law § 265.03, subd. (3).) An individual must obtain an unrestricted license to " 'have and carry' " a concealed " 'pistol or revolver' " to carry a firearm outside his or her home or place of business. (*Bruen*, at p. 2123.)

Prior to *Bruen*, an applicant had to prove "proper cause exists" to issue the license. (*Bruen*, *supra*, 142 S.Ct. at p. 2123.) In other words, an applicant had to "demonstrate[ ] a special need for self-defense." (*Id.* at p. 2122.) *Bruen* noted that six other states, including California, had similar "proper cause" requirements in their concealed carry licensing frameworks. (*Ibid.*)

The majority in *Bruen* repudiated the two-step approach used by the courts following *Heller* and *McDonald* to evaluate firearm restrictions as "one step too many." (*Bruen*, *supra*, 142 S.Ct. at p. 2127.) The *Bruen* majority

8

stated that, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " (*Id.* at p. 2126.) In other words, conduct that falls within the "plain text" of the Second Amendment may be protected unless the government can identify an "American tradition" justifying the regulation. (*Id.* at p. 2138.)

To meet this unusual burden, the *Bruen* majority explained that the government need not identify a "historical *twin*," but instead a "representative historical *analogue*" imposing a "comparable burden on the right of armed self-defense" that was "comparably justified." (*Bruen*, *supra*, 142 S.Ct. at p. 2133.) The *Bruen* majority also advised that "when it comes to interpreting the Constitution, not all history is created equal" because " 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*' " (*Id.* at p. 2136.) "The Second Amendment was adopted in 1791; the Fourteenth in 1868." (*Ibid.*) According to the *Bruen* majority, "Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." (*Id.* at p. 2156) New York cited, among other things, historical regulations that broadly prohibited public carriage of firearms. (*Id.* at pp. 2153–2154.) The majority in *Bruen* characterized these restrictions as "localized" or "exceptional" in nature. (*Id.* at p. 2154.) The *Bruen* majority concluded that New York did not meet its burden to identify

9

an "American tradition" justifying its "proper cause" language, and concluded the requirement was unconstitutional. (*Id.* at p. 2156.)

## II. California's Statutory Framework for Gun Safety

California "has a multifaceted statutory scheme regulating firearms." (*Peruta v. County of San Diego* (9th Cir. 2016) 824 F.3d 919, 925.) Our brief summary of California's statutory framework regulating firearms is not comprehensive, but rather intended to highlight aspects relevant to our constitutional analysis.

### A. *Criminal Prohibitions in Section 25850*

Section 25850 provides that a person "is guilty of the offense of carrying a loaded firearm when the person carries a loaded firearm on the person or in a vehicle while in any public place or on any public street in an incorporated city or in any public place or on any public street in a prohibited area of unincorporated territory." (§ 25850, subd. (a).) Section 25850 does not criminalize possession of a firearm per se, but rather prohibits carrying a *loaded* firearm. It also does not criminalize possession in any public place, but rather applies to a public place or street in an *incorporated city* or in a prohibited area of an unincorporated territory.[3]

A person properly licensed to carry a firearm will not be criminally liable just for possessing one. (§ 26010.) Section 25850 "does not apply to the carrying of any handgun by any person as authorized pursuant to Chapter 4

---

[3] San Francisco became an incorporated city in 1850. (Stats. 1850, ch. 98, p. 223.) A "public place" in an incorporated city is an area that is accessible to the public "without challenge." (*People v. Strider* (2009) 177 Cal.App.4th 1393, 1401–1402.)

(commencing with Section 26150) of Division 5," which are provisions for applying for a license to carry a firearm.[4] (§ 26010.)

## B. *Minors and Firearms*

California law does not contemplate a minor relying on a firearm for self-defense. California bans minors, like D.L., from even possessing a handgun or a semiautomatic centerfire rifle—let alone obtaining a concealed carry license. (§ 29610, subds. (a), (b).) A small number of exceptions exist to that general rule. These exceptions generally involve the minor being accompanied by a "responsible adult" and either actively engaging in, or being "in direct transit to or from," a sporting, recreational, agricultural, or business activity that "involves the use of a firearm." (§ 29615, subd. (a)– (c).)[5]

## C. *Concealed Carry Licenses in California*

California's procedures for obtaining a license to carry a concealed firearm are set out in sections 26150 (for applications made to a sheriff's office) and 26155 (for applications made to a police department). California also includes a procedure for obtaining a license to openly carry a firearm in

---

[4] California's statutory framework includes multiple exemptions to the prohibition against carrying a loaded firearm, which are only relevant to our constitutional analysis to the extent they help confirm that the prohibitions against carrying a loaded firearm in a city are not overbroad. (See §§ 25900– 25925 [peace officer exemptions]; 26000–26060 [including exemptions related to military, target ranges, shooting clubs, armored vehicles, retired federal officers, firearms training, and hunting].) D.L. has not made an argument based on overbreadth.

[5] There are multiple exceptions in section 29615 to the general prohibition against a minor possessing a firearm, most of which relate to use supervised by an adult in connection with competitive shooting, hunting, and use when acting in movies, television, or other theatrical events. (§ 29615, subds. (a)–(e).)

11

counties with a population fewer than 200,000 residents. (§§ 26150, subds. (b)(1)–(2), 26144, subds. (b)(1)–(2).)

The requirement that an applicant show "good cause" for issuance of a concealed carry license is the second of four conditions set out in the licensing statutes. Section 26150 provides, in relevant part: "(a) When a person applies for a license to carry a pistol, revolver, or other firearm capable of being concealed upon the person, the sheriff of a county may issue a license to that person upon proof of all of the following: [¶] (1) The applicant is of good moral character. [¶] (2) Good cause exists for issuance of the license. [¶] (3) The applicant is a resident of the county or a city within the county, or the applicant's principal place of employment or business is in the county or a city within the county and the applicant spends a substantial period of time in that place of employment or business. [¶] (4) The applicant has completed a course of training as described in Section 26165. [¶] (b) The sheriff may issue a license under subdivision (a) in either of the following formats: [¶] (1) A license to carry concealed a pistol, revolver, or other firearm capable of being concealed upon the person. [¶] (2) Where the population of the county is less than 200,000 persons according to the most recent federal decennial census, a license to carry loaded and exposed in only that county a pistol, revolver, or other firearm capable of being concealed upon the person." (§ 26150, subds. (a)–(b).)

In summary, after the Attorney General repudiated the "good cause" requirement the day after the *Bruen* decision, the sheriff (§ 26150) or police chief (§ 26155) may issue a license to an adult who applies for a license to carry a pistol, revolver, or other firearm capable of being concealed upon proof that (1) the applicant is of good moral character; (2) the applicant is a resident of the county or city, or has principal place of employment or

12

business and spends a substantial period of time in that place; and (3) the applicant has completed a course of training as described in section 26165.

An applicant for a license is fingerprinted and must pass a background check.[6] (§§ 26185, subd. (a), 26195, subd. (a).) The background check is intended to confirm the applicant is not disqualified from possessing or owning a firearm (for example, due to prior felony convictions or past acts of domestic violence). (§§ 26185, subd. (a)(2), 26195, subd. (b)(1), 29800, 29805.)

The requisite firearm training program permits an applicant to obtain a "Firearm Safety Certificate" to be able to purchase a gun; the certificate must be shown to a licensed dealer before being able to make the purchase. (§§ 26840, 27540, subd. (e).)[7] For new license applicants, the training course must be between 8 and 16 hours long, and include "instruction on firearm safety, firearm handling, shooting technique, and laws regarding the permissible use of a firearm" as well as "live-fire shooting exercises on a firing range and shall include a demonstration by the applicant of safe handling of, and shooting proficiency with, each firearm that the applicant is applying to be licensed to carry." (§ 26165, subds. (a)(1)–(3).)

### III. Forfeiture

D.L. concedes that he did not make a facial constitutional attack on section 25850 in the trial court. He argues that he did not forfeit the

---

[6] Justice Kavanaugh's concurring opinion in *Bruen* confirms his belief that requirements including "fingerprinting, a background check, a mental health records track, and training in firearms handling," among others, remain constitutional. (*Bruen, supra,* 142 S.Ct. at p. 2162 (conc. opn. of Kavanaugh, J.).)

[7] California law makes exceptions to the safety training requirements, which are set out in sections 31700 to 31835. For example, a further training class is not required for honorably retired police officers who want to obtain a concealed carry license. (§ 31700, subd. (a)(1).)

argument, however, because he could not have predicted the change in the law heralded by *Bruen*. D.L. also notes that his facial challenge to the constitutionality of section 25850 is a pure question of law, which we review de novo. (*People v. Santos* (2019) 38 Cal.App.5th 923, 931 [concluding no forfeiture where new case law "represents an unforeseen significant shift in the pertinent law that trial counsel could not have anticipated, thus excusing the failure to raise the issue"]; *In re Sheena K.* (2007) 40 Cal.4th 875, 887 [challenge based on facial constitutional defect capable of correction without reference to particular trial court record can be said to present a pure question of law].) The Attorney General does not argue to the contrary. We see no reason to conclude D.L. has forfeited his argument on appeal.

## IV. Standing

The Attorney General argues that D.L. does not have standing to challenge the constitutionality of section 25850 and California's framework for licensing guns. According to the Attorney General, D.L. "has to show the public carry licensing scheme is unconstitutional as applied to him," but cannot do so because D.L. never applied for a license and cannot establish that, if he had, he would have been denied solely because of the unconstitutional "good cause" requirement.

We disagree with the Attorney General and conclude that D.L. has standing here because he is challenging the *facial* constitutionality of a criminal statute under which he has been convicted. We begin by reviewing the features of such constitutional challenges.

### A. *Facial vs. As Applied Constitutional Challenges*

" 'A defendant challenging the constitutionality of a statute carries a heavy burden: "The courts will presume a statute is constitutional unless its unconstitutionality clearly, positively, and unmistakably appears; all

14

presumptions and intendments favor its validity." ' " (*People v. Bocanegra* (2023) 90 Cal.App.5th 1236, 1250 (*Bocanegra*), quoting *People v. Fuiava* (2012) 53 Cal.4th 622, 696, quoting *People v. Falsetta* (1999) 21 Cal.4th 903, 912–913.)  Typically, a litigant may challenge the constitutionality of a statute in two ways:  on its face or as applied.  Here, D.L. explains that he is challenging the constitutionality of section 25850 and California's licensing framework only "on their face."

"A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual."  (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 (*Tobe*).)  A facial challenge seeks to void the statute as a whole by showing that " 'no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all its applications."  (*Washington State Grange v. Washington State Republican Party* (2008) 552 U.S. 442, 449 (*Washington State Grange*).)  Put another way, "a facial challenge must fail where the statute has a ' "plainly legitimate sweep." ' "  (*Id.* at p. 449, quoting *Washington* v. *Glucksberg* (1997) 521 U.S. 702, 739–740 & fn. 7 (conc. opn. of Stevens, J.).)  The law requires us to examine the "facial requirements" of the statute in order to determine whether its provisions " ' "inevitably pose a present total and fatal conflict with applicable constitutional prohibitions." ' "  (*Tobe*, at p. 1084, citing *Arcadia Unified School Dist. v. State Dept. of Education* (1992) 2 Cal.4th 251, 267.)  We join the California courts that have applied this standard when evaluating facial challenges to gun regulations based on *Bruen*.  (*People v. Alexander* (2023) 91 Cal.App.5th 469, 480 (*Alexander*) [§§ 29800 subd. (a)(1), 30305, subd. (a)(1) prohibiting felons from possessing firearms and ammunition, are facially valid because the challenged conduct is not covered

15

by the Second Amendment]; *Regina v. State of California* (2023) 89 Cal.App.5th 386, 401, 403–404 [rejecting facial constitutional challenge to § 28220, subd. (f)(4) because Department of Justice notification to dealer for firearms transfer does not implicate the right to bear arms].)

D.L. elected not to challenge section 25850 or the concealed carry licensing statutes "as applied" to him. In other words, D.L. does not raise any question about whether he was or would have been denied a license and, if so, why.[8] Unlike a "facial challenge," an "as applied" challenge may seek "relief from a specific application of a facially valid statute or ordinance to an individual or class of individuals who are under allegedly impermissible present restraint or disability as a result of the manner or circumstances in which the statute or ordinance has been applied[.]" (*Tobe, supra*, 9 Cal.4th at p. 1084.) An "as applied" challenge "contemplates analysis of the facts of a particular case or cases to determine the circumstances in which the statute or ordinance has been applied and to consider whether in those particular circumstances the application deprived the individual to whom it was applied of a protected right." (*Ibid.*) "When a criminal defendant claims that a facially valid statute or ordinance has been applied in a constitutionally impermissible manner to the defendant, the court evaluates the propriety of the application on a case-by-case basis to determine whether to relieve the defendant of the sanction." (*Ibid.*, citing *Hale v. Morgan* (1978) 22 Cal.3d

---

[8] There are at least two reasons why D.L. could not have gotten a concealed carry license that have nothing to do with the "good cause" requirement: D.L. was a minor and he had a prior felony record. (See §§ 29610 [prohibiting possession by a minor], 29615, subds. (a)–(e) [barring minors from carrying firearms except for permitted activities and with supervision], 29800, subd. (a)(1) [prohibiting possession by convicted felon].)

388, 404.)  With this framework in mind, we analyze whether D.L. has standing to make the facial challenge he presents here.

## B.  *D.L.'s Standing*

D.L. contends that he has standing to assert a facial challenge to section 25850 because he was injured through his conviction under a statute that incorporated an unconstitutional licensing requirement.  D.L. relies on a concept of standing articulated in *Smith v. Cahoon* (1931) 283 U.S. 553 (*Smith*), where prosecutors charged the defendant (a "private carrier for hire" in Florida) with operating vehicles in violation of a state statute requiring drivers to obtain a "certificate of public convenience and necessity."  (*Id.* at pp. 556–558.)  The *Smith* decision noted the general rule that "when a statute, valid upon its face, requires the issue of a license or certificate as a condition precedent to carrying on a business or following a vocation, one who is within the terms of the statute, but has failed to make the required application, is not at liberty to complain because of his anticipation of improper or invalid action in administration."  (*Id.* at p. 562.)  The *Smith* decision also identified an important exception, explaining that the general rule "is not applicable where a statute is invalid upon its face and an attempt is made to enforce its penalties in violation of constitutional right.  In the present instance, the appellant has been arrested and held for trial.  He is in jeopardy, and the state court, entertaining his application for discharge, has denied the constitutional right asserted.  The question of the validity of the statute, upon which the prosecution is based, is necessarily presented."  (*Ibid.*)

The principle that criminal defendants may raise a facial challenge to the statutory framework under which they are convicted has been adopted in other contexts.  For example, in *Shuttlesworth v. Birmingham* (1969) 394

17

U.S. 147 (*Shuttlesworth*), a minister leading a civil rights march was convicted of violating an ordinance prohibiting participation in a " 'parade or procession or other public demonstration' " without first obtaining a permit. (*Id.* at p. 148.)  While there was evidence presented in a related case that the minister tried to request a permit, *Shuttlesworth* explained that the decisions of the United States Supreme Court "have made clear that a person faced with such an unconstitutional licensing law may ignore it and engage with impunity in the exercise of the right of free expression for which the law purports to require a license." (*Id.* at p. 151.)  " 'The Constitution can hardly be thought to deny to one subjected to the restraints of such an ordinance the right to attack its constitutionality, because he has not yielded to its demands.' " (*Ibid.*)  The *Shuttlesworth* decision reversed the conviction.  (*Id.* at p. 159.)

Examples following *Shuttlesworth* are also found in California law.  For example, in *Aaron v. Municipal Court* (1977) 73 Cal.App.3d 596, petitioners sought a writ of prohibition to bar their prosecution for violation of a municipal ordinance that outlawed soliciting without a license.  (*Id.* at p. 599.)  While petitioners' standing to challenge the constitutionality of the ordinance was not challenged, Division One of this court cited *Shuttlesworth* and noted that a "person faced with an unconstitutional licensing law may ignore it and engage with impunity in the exercise of the right of free expression for which the law purports to require a license, and he is not precluded from attacking its constitutionality because he has not applied for a permit." (*Aaron*, at p. 599, fn. 2 [gathering cases].)

Our Supreme Court adopted the same approach in *Burton v. Municipal Court of Los Angeles* (1968) 68 Cal.2d 684.  There, officials charged two theater managers with violation of a municipal code prohibiting the

18

exhibition of films without a permit from the Board of Police Commissioners. (*Id.* at pp. 686–687.) The Board of Police Commissioners then argued that the managers lacked standing to challenge the ordinance as unconstitutional because no permit application had been refused. (*Id.* at p. 687.) The court rejected the standing argument. (*Id.* at p. 688.) The *Burton* decision explained, "It is settled that a person has the standing to challenge a statute on the ground that it delegates overly broad licensing authority to an administrative officer whether or not his conduct could be proscribed by a properly drawn enactment and whether or not he has applied for a license. One who could have obtained a license for the asking may call into question the whole scheme of licensing when he is prosecuted for failure to procure it. Standing is recognized in such a situation because of the dangers inherent in tolerating, in the realm of the First Amendment, the existence of a penal statute susceptible of sweeping and improper application." (*Ibid.*)

As a final example from our Supreme Court, in *People v. Fogelson* (1978) 21 Cal.3d 158, a Hare Krishna adherent was convicted of soliciting contributions on public property without a permit, which violated a Los Angeles ordinance. (*Id.* at pp. 161–162.) The court found "no merit" to the city's argument that the appellant lacked standing because he did not apply for a permit. (*Id.* at p. 162, fn. 3.) The *Fogelson* decision again deemed it " 'settled that petitioners have standing to attack the constitutional validity of [an] ordinance which they are charged with having violated even though they have failed to allege that they attempted to comply with its permit requirement.' " (*Ibid.*) The court also emphasized the importance of standing to bring a facial challenge, regardless of how the regulation applies to the particular petitioner, because "case-by-case adjudication may not fully vindicate the constitutional rights at stake." (*Id.* at p. 163.) The court

19

taught: "The actual application of an overbroad ordinance is not its only vice; it may also have a substantial deterrent impact or 'chilling effect' on the exercise of constitutional rights. Faced with a regulation that threatens to impose sanctions upon free speech or the free exercise of religion, significant numbers of persons may elect not to exercise those rights rather than undergo the rigors of litigation and the risk of eventual punishment. While it is crucial that persons not be punished for having exercised their rights of free speech and religion, it is equally important that they not be deterred from such conduct." (*Id.* at pp. 163–164, fn. omitted.)

The Attorney General suggests that the authority for standing of criminal defendants charged or convicted under an allegedly unconstitutional statutory licensing framework is limited to the "unique context" of the First Amendment. On the record here, we are not prepared to impose such a categorical restriction. As noted above, the United States Supreme Court described this principle in *Smith*, where a criminal defendant challenged a statute under the due process and equal protection clauses of the Fourteenth Amendment. (*Smith*, *supra*, 283 U.S. at p. 556.) It is unclear whether the United States Supreme Court would agree with the Attorney General's interpretation, and a more cautious view seems prudent in view of the court's recent dicta comparing the First and Second Amendments. (See, e.g., *Heller*, *supra*, 554 U.S. at p. 635.)

The remaining published decisions from other courts discussed by the Attorney General are distinguishable from the circumstances here, given D.L.'s "narrow" facial challenge. For example, in *People v. Rodriguez* (2022) 171 N.Y.S.3d 802, the defendant moved to dismiss two charges of criminal possession in light of *Bruen*. (*Rodriguez*, at p. 805.) The New York court concluded that the defendant lacked standing to present his broad challenge

20

to the regulation on gun possession, explaining that "he does not seek to demonstrate either that the licensing law was unconstitutional—we already know it was—or that it was unfairly applied to him—it wasn't applied to him at all—but that the Second Amendment itself, the right to bear arms, confers an absolute entitlement to possess concealed firearms in public, license be damned." (*Ibid.*) D.L. explicitly disclaims attempting to make the broad argument articulated in *Rodriguez*. While we agree with the ultimate conclusion expressed in *Rodriguez*—California's criminal penalties for possession of a loaded firearm are not unconstitutional on account of the holding in *Bruen* that a good cause requirement to obtain a license to carry a concealed weapon is invalid—we reach that conclusion by adjudicating the facial challenge on the merits.[9]

The decision in *United States v. DeCastro* (2d Cir. 2012) 682 F.3d 160 (*DeCastro*), cited by the Attorney General, is also unhelpful in the present context. There, a court convicted the defendant in a bench trial of transporting firearms into New York from another state, in violation of a federal statute. (*Id.* at p. 161.) The defendant argued that the statute was unconstitutional on its face. (*Ibid.*) He alternatively argued that the statute plus New York's licensing framework violated his Second Amendment rights because the regulations made it "virtually impossible for him to obtain a handgun for self-defense." (*Ibid.*) In the *DeCastro* decision, the court evaluated (and rejected) the defendant's facial challenge to the statute alone without raising the question of standing. (*Id.* at pp. 168–169.) It then concluded that the defendant lacked standing for his alternative argument,

---

[9] The Attorney General also relied on the appellate decision *People v. Velez* (Dec. 2, 2022, F081839) 2022 Cal.App. Lexis 986, but that decision was depublished by *People v. Velez* (Mar. 1, 2023, S277985) 2023 Cal. Lexis 1175.

21

related to the licensing scheme, because he had not applied for a gun license. (*Id.* at p. 164.) The *DeCastro* decision is again distinguishable because there the defendant could not have avoided the charge (transportation of firearms into New York from another state) by simply obtaining a license for possession. The same is true of the plaintiffs in *Kendrick v. Bruck* (2022) 586 F.Supp.3d 300, who brought a *civil* lawsuit challenging the constitutionality of New Jersey statutes regulating transfer and possession of firearms. (*Id.* at p. 304.)

Both the parties in *DeCastro* and *Kendrick* lacked the type of injury necessary for standing as described in *Smith*: to be subjected to prosecution based on an allegedly facially unconstitutional statute. Again, we note that D.L. does not make an "as applied" challenge, and lacks standing to do so since he never sought and could not have qualified for a concealed carry license for reasons having nothing to do with the "good cause" requirement at issue on his facial challenge. But, given D.L. is subject to a true finding (the juvenile equivalent of a criminal conviction for an adult) under the possession statute he seeks to challenge as unconstitutional on its face, we proceed to consider the merits.

## V. D.L.'s Facial Constitutional Challenge

D.L.'s facial challenge to section 25850 is premised on the notion that California's "good cause" licensing requirement is no longer constitutional after *Bruen*. The Attorney General concedes this. As described above, he advised firearm-permitting agencies that they can and should continue to enforce all other statutory prerequisites for a public carry license, but can no longer require a demonstration of "good cause" to obtain a concealed carry

22

permit.[10]

The Attorney General, however, argues that D.L.'s challenge to the constitutionality of his conviction under section 25850 can be defeated because the "good cause" requirement can be severed from the remainder of the licensing framework. We begin with the basic principles of severability.

## A. *Severability Principles*

The concept of severability is an important tool in constitutional analysis. " 'Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem' " by "severing any 'problematic portions while leaving the remainder intact.' " (*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.* (2010) 561 U.S. 477, 508.) The unconstitutionality of a part of a statute " 'does not necessarily defeat or affect the validity of its remaining provisions,' " and so the " 'normal rule' is 'that partial, rather than facial, invalidation is the required course.' " (*Ibid.*) Put another way, "we try not to nullify more of a legislature's work than is necessary, for we know that '[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.' " (*Ayotte v. Planned Parenthood* (2006) 546 U.S. 320, 329, quoting *Regan v. Time, Inc.* (1984) 468 U.S. 641, 652; *Alaska Airlines, Inc. v. Brock* (1987) 480 U.S. 678, 684 [" ' "Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law" ' "];

---

[10] Given that the Attorney General has conceded this point, we do not make our own independent determination regarding the constitutionality of the "good cause" requirement in light of *Bruen*. (U.S. Const., art. VI, cl. 2 [supremacy clause]; *People v. Fletcher* (1996) 13 Cal.4th 451, 469, fn. 6 [United States Supreme Court "decisions on questions of federal constitutional law are binding on all state courts under the supremacy clause of the United States Constitution"].)

*Brockett v. Spokane Arcades, Inc.* (1985) 472 U.S. 491, 504 ["the normal rule [is] that partial, rather than facial, invalidation is the required course"].) The courts have traditionally applied a presumption in favor of severability. (See *Regan*, at p. 653 [noting presumption].)

Legislators sometimes include provisions that expressly provide that any portion of a statute that is found invalid or unconstitutional may be severed. (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 270 (*Matosantos*).) Alternatively, legislators may expressly provide the opposite, and prohibit the severability of any component of a statute. In those instances, a finding that a portion of a statute is invalid will render the entire statute invalid as well. The licensing statutes at issue here, sections 26150 and 26155, lack any provision discussing severability one way or another, and so severance is neither presumed nor prohibited. (See *Matosantos*, at p. 270.)

In the absence of express language confirming or prohibiting severability, we consider three criteria to determine whether we may save a statute by severing an unconstitutional provision in it: whether the provision is (1) " 'grammatically,' " (2) " 'functionally,' "and (3) " 'volitionally separable.' " (*Matosantos*, *supra*, 53 Cal.4th at p. 271.) "Grammatical separability, also known as mechanical separability, depends on whether the invalid parts 'can be removed as a whole without affecting the wording' or coherence of what remains." (*Ibid.*) "Functional separability depends on whether 'the remainder of the statute " 'is complete in itself. . . .' " ' " (*Ibid.*) "Volitional separability depends on whether the remainder ' "would have been adopted by the legislative body had the latter foreseen the partial invalidation of the statute. " ' " (*Ibid.*) With these principles in mind, we turn to the "good cause" provision of the licensing statutes.

24

## B. *Severability of the "Good Cause" Licensing Provision*

The provision of section 26150, subdivision (a)(2) and section 26155, subdivision (a)(2) that an applicant show "[g]ood cause" for issuance of a concealed carry license satisfies the criteria for severability, making it inappropriate to find the statutes facially unconstitutional. First, the provision is grammatically separable because it is contained in a discrete subdivision. Excising subdivision (a)(2) does not impair the wording or coherence of the other requirements in subdivision (a). (*Matosantos, supra,* 53 Cal.4th at p. 271.) Second, the provision is functionally separable because the remaining provisions are "complete" in and of themselves, and "capable of independent application." (*Ibid.*; *People's Advocate, Inc. v. Superior Court* (1986) 181 Cal.App.3d 316, 331.)

Third, the "good cause" provision is "volitionally severable." The remaining requirements for obtaining a license to carry a concealed firearm—a background check, sufficient residential or business ties to the county or city, and completion of a firearm training course—are objective criteria and do not rely on the "good cause" requirement in any way. The Attorney General's direction to firearm-permitting agencies contemplates application of the remaining requirements without the "good cause" provision. Moreover, a contrary interpretation would thwart all efforts to regulate the concealed carry of loaded firearms in an incorporated city, as contemplated by sections 26150, 26155, and 25850.

We also infer volitional severability based on the legislative history of California's gun licensing provisions. The Legislature replaced former section 12050 in 2010 with the sections now at issue here—26150 and 26155. When it did so, the Legislature included the same general requirements for obtaining a license to carry a concealed weapon, which had been in former

section 12050, without substantive change, but "reorganize[d]" them from a single paragraph into distinct paragraphs. (Stats. 2010, ch. 711, § 6.) This reorganization illustrates that the Legislature viewed the requirements as separate, and as functioning independently of one another.

## C. *Severability in the Context of D.L.'s Pre-*Bruen *Conviction*

D.L. does not make any argument challenging the grammatical, functional, or volitional separability of the "good cause" licensing requirement. Moreover, he concedes that such severance can allow for constitutional application of the licensing statutes going forward to convictions after *Bruen*. D.L. instead argues that severability cannot be applied retroactively to cure the harm from a pre-*Bruen* conviction based on unlicensed possession. As he did in his argument on standing, D.L. relies on *Smith* to support this contention.

The *Smith* case, however, is not helpful to D.L.'s argument opposing severability. Recall that the defendant in *Smith* had been charged with operating vehicles without a required "certificate of public convenience and necessity." (*Smith, supra*, 283 U.S. at p. 556.) The United States Supreme Court concluded that the statute did not distinguish between a common carrier and a private carrier, like Smith, and that such a regulation of the business of a private carrier was "manifestly beyond the power of the state." (*Id.* at p. 562.) The *Smith* decision then addressed the severability of the statute. If the statute were severed to apply the certificate requirement to common carriers but not private carriers, then the statute as it applied to private carriers would be "void for uncertainty" as it would prescribe " 'no standard of conduct that it is possible to know.' " (*Id.* at p. 564.) In other words, there would be no "valid scheme applicable to private carriers." (*Ibid.*) There really was no way to know "what eventually [would] be eliminated and

26

what [would] be left" after eliminating the unconstitutional aspects of the law (*ibid.*), because the requirements of the lawful and unconstitutional aspects of it were intertwined and not functionally or volitionally severable. Here, unlike *Smith*, a valid firearm licensing framework remains even if the "good cause" requirement is severed. Severability does not create the same uncertainty the *Smith* decision suggested might have existed in that case.

Finally, we observe that D.L.'s argument—that severability does not cure the harm suffered from his pre-*Bruen* conviction—could only make sense in the context of an "as applied" challenge. (See *Smith, supra,* 283 U.S. at pp. 556, 557 [discussing constitutional validity of statute on its face but noting appellant presented challenge "as applied to him"].) Even if D.L. had asserted an as applied challenge and had standing to do so, we would not be persuaded by the merits of such an argument: the true finding as to D.L. (*i.e.,* his conviction) had nothing to do with the "good cause" licensing requirement.

### D. *Analysis of Section 25850 After Severing "Good Cause" Licensing Requirement*

Given our conclusion that the "good cause" requirement from sections 26150 and 26155 is severable, California's firearm licensing framework—and the criminal penalties under section 25850—remain valid. D.L. does not argue that *Bruen* invalidated any of the other conditions set out in sections 26150 or 26155 for obtaining a concealed carry license. (See fn. 6, *ante,* quoting *Bruen, supra,* 142 S.Ct. at p. 2162 (conc. opn. of Kavanaugh, J.).)

First, we note the *Bruen* majority's actual holding was quite limited— that New York's "proper-cause" licensing requirement was unconstitutional. The *Bruen* majority wrote that its analogical reasoning under the Second Amendment was "neither a regulatory straightjacket nor a regulatory blank check." (*Bruen, supra,* 142 S.Ct. at p. 2133.) Indeed, the *Bruen* majority

27

explained that "nothing" in its analysis should be interpreted to suggest the unconstitutionality of licensing regimes that require applicants to "undergo a background check or pass a firearms safety course" to obtain a license. (*Bruen, supra,* 142 S.Ct. at p. 2138, fn. 9.)

Second, *Bruen* did not undermine regulation of guns based on objective criteria. The majority repeated the discussion in *Heller* that there are limits to the exercise of an individual's right to armed self-defense; the right " 'was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.' " (*Bruen, supra,* 142 S.Ct. at p. 2128.)[11]

Third, California courts have recently rejected facial challenges to the constitutionality of other statutes regulating firearm possession, including possession of firearms and ammunition by felons. (*Alexander, supra,* 91 Cal.App.5th at p. 480; *People v. Odell* (2023) 92 Cal.App.5th 307 (*Odell*).) In *Alexander,* the Fourth District reasoned that these regulations were not covered by the Second Amendment because, as set forth in *Heller,* it confers " 'the right of *law-abiding,* responsible citizens to use arms in defense of hearth and home.' " (*Alexander,* at p. 478.) A felon is, by definition, "someone who has committed a crime and as such is not law-abiding," and so felons "are not included among the class of people afforded rights under the Second Amendment." (*Ibid.*) In *Odell,* the Second District agreed with *Alexander* and noted: "It was no accident the *Bruen* majority repeated the qualifier 'law-abiding' some 13 times." (*Odell,* at p. 317.) "People who have been

---

[11] The recent decision in *Bocanegra* is an example. (See *Bocanegra, supra,* 90 Cal.App.5th at p. 1255 ["Like the Supreme Court in *Bruen,* here, we do no more than apply the test announced in *Heller* . . . we conclude the statute prohibiting possession of assault weapons does not violate the Second Amendment as construed by *Heller*"].)

convicted of a felony are not 'law-abiding.' " (*Ibid.*)  The court in *Alexander* also explained that *Bruen* did not alter *Heller*'s description of the people who are afforded Second Amendment rights, but "instead reaffirmed that the Second Amendment right ' "to use arms" for self-defense' belongs to ' "law-abiding, responsible citizens." ' " (*Alexander*, at p. 478.)

We agree with *Alexander* and *Odell* that *Bruen* did not expand "the categories of people who may lawfully possess a gun," and that those convicted of a felony are squarely in a category where gun possession is off-limits due to their prior criminal conduct.  (*Bruen, supra,* 142 S.Ct. at pp. 2157–2158 (conc. opn. of Alito, J.).)

Finally, the remaining concealed carry licensing requirements, after severing the "good cause" condition, are consistent with the goals that California has advanced since the founding of our state:  ensuring Californians who carry firearms are responsible and law-abiding, live in or have substantial contact with the licensing jurisdiction (since local law enforcement is tasked with licensee compliance), and know how to safely handle a gun.  The California Supreme Court's reasoning in *Ex Parte Cheney* (1891) 90 Cal. 617, 621, when the California Supreme Court first upheld San Francisco's ban on carrying a loaded gun, still resonates over a century and a half later:  "It is a well-recognized fact that the unrestricted habit of carrying concealed weapons is the source of much crime, and frequently leads to causeless homicides, as well as to breaches of the peace, that would not otherwise occur.  The majority of citizens have no occasion or inclination to carry such weapons, and it is often the case that the innocent by-stander is made to suffer from the unintended act of another, who, in the heat of passion, attempts to instantly resent some fancied insult or trivial inquiry.  It is to protect the law-abiding citizen, as well as to prevent a breach of the

29

peace or the commission of crime, that the ordinance in question has been passed." (*Ex Parte Cheney*, at p. 621.)

For all of these reasons, we conclude that section 25850 is enforceable and is not unconstitutional on its face. It does not pose a present total and fatal conflict with applicable constitutional prohibitions. (*Washington State Grange*, *supra*, 552 U.S. at p. 449.)

## DISPOSITION

The judgment is affirmed.

_____
Markman, J.*

We concur:


_____
Stewart, P.J.


_____
Miller, J.


*In re D.L.* (A164432)


\*Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

31

| | |
|---|---|
| Trial Court: | San Francisco County Superior Court |
| Trial Judge: | Hon. Ellen L. Chaitin |
| Attorneys for Defendant and Appellant: | By appointment of the Court of Appeal under the First District Appellate Project Avatar Legal, PC Cynthia M. Jones |
| Attorneys for Plaintiff and Respondent: | Rob Bonta Attorney General of California |
| | Lance E. Winters Chief Assistant Attorney General |
| | Jeffrey M. Laurence Senior Assistant Attorney General |
| | Bridget Billeter Deputy Attorney General |
| | Masha A. Dabiza Deputy Attorney General |